NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MILAGROS CHALUISAN,<br><br>        Plaintiff,<br><br>        v.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>        Defendant. | **Hon. Dennis M. Cavanaugh**<br><br>**OPINION**<br><br>Civil Action No. 07-CV-3130 (DMC) |

DENNIS M. CAVANAUGH, U.S.D.J.:

       This matter comes before the Court upon Plaintiff Milagros Chaluisan's ("Plaintiff") appeal from the Commissioner of the Social Security Administration's ("Commissioner") final decision denying her request for Supplemental Security Income ("SSI") under the Social Security Act (the "Act") for the period June 17, 1984 through June 17, 1998. The Court has jurisdiction to review this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and decides this matter without oral argument. See Fed. R. Civ. P. 78. Because the Commissioner failed to adequately explain his reasons for rejecting the opinion of Plaintiff's treating physician Dr. Sabato, and because further explanation is needed in support of the Commissioner's Zebley finding, this matter is remanded for further explanation on those issues.

**I.     BACKGROUND**[1]

   A.     *Procedural Background*

Plaintiff's mother, Jimenez Chaluisan, filed the original benefits claim on her daughter's behalf on August 21, 1982. No surviving documents exist from this claim, and it is referred to only in passing in subsequent benefits proceedings. It appears that the claim was based on Plaintiff's childhood scoliosis, for which Plaintiff had a "Harrington" rod surgically implanted to straighten her spine in 1983. The Social Security Administration ("SSA") rejected this initial claim, and Plaintiff did not appeal.

Following the Supreme Court's decision in Sullivan v. Zebley, 493 U.S. 521 (1990), the Zebley class plaintiffs and the government entered into a stipulation (the "Settlement") requiring re-adjudication of essentially all children's SSI claims decided between January 1, 1980 and February 27, 1990. Because Plaintiff was considered a member of the Zebley class, her claim was reopened in 1993. In this proceeding, the SSA found that Plaintiff was disabled from 1982 to 1984, but not thereafter. Plaintiff appealed this decision, and the matter was heard by Administrative Law Judge ("ALJ") Louis V. Zamora. Plaintiff testified at this appeal on August 25, 1993. In a decision dated June 23, 1994, ALJ Zamora affirmed the determination that Plaintiff was disabled from 1982 to 1984, and additionally found that Plaintiff was again disabled beginning on April 28, 1992 and was eligible for benefits going forward. This decision was based primarily on the opinion of Edward Valentine, M.D., who attributed Plaintiff's disability to

---

[1] The facts set-forth in this Opinion are taken from the Parties' statements in their respective moving papers.

severe back pain caused by the Harrington rod and scoliosis, which was aggravated by obesity and radiation therapy for Hodgkin's Disease.

Plaintiff appealed ALJ Zamora's decision in August 1994 to the Appeals Council, claiming she had also been disabled during the gap period between 1984 and 1992. On May 15, 1995, the Appeals Council reversed ALJ Zamora's decision and remanded the claim for a new hearing. ALJ Zamora held hearings on April 29, 1996 and March 24, 1998, with Plaintif testifying at both hearings. In a decision dated May 29, 1998, ALJ Zamora again found that Plaintiff was disabled from 1982 to 1984 and beginning on April 28, 1992, but this time found that Plaintiff's disability ended on August 13, 1993. In this new decision, ALJ Zamora rejected the prior opinion of Dr. Valentine as unsupported and inconsistent with other medical evidence. ALJ Zamora also discounted the opinion of Plaintiff's orthopedic surgeon, Stanley Hoppenfeld, M.D., who reported that Plaintiff was disabled. Plaintiff appealed ALJ Zamora's second decision to the Appeals Council.

Concurrently, Plaintiff initiated a new application for benefits while the appeal was pending. This new application was rejected on the initial and reconsideration levels. A third hearing on the new application was held before ALJ Dennis O'Leary on July 28, 1999, during which Plaintiff testified as to her disability. In a decision dated September 30, 1999, ALJ O'Leary discounted Plaintiff's testimony because it was not supported by medical evidence from treating physicians.

Plaintiff appealed ALJ Zamora's decision to the Appeals Council. The Appeals Council reversed both ALJ Zamora's second decision dated May 29, 1998 and ALJ O'Leary's decision

3

dated September 30, 1999. The two applications were consolidated and a new hearing on the claims was ordered before ALJ O'Leary.

Hearings on the consolidated applications were held on August 16, 2001 and October 25, 2001, with Plaintiff testifying in the former only. In a decision dated November 21, 2001, ALJ O'Leary affirmed that Plaintiff was disabled during the 1982 to 1984 period, but he found no disability from June 18, 1984 to June 1998, thereby cancelling the benefits awarded by ALJ Zamora for Plaintiff's disability for the period from April 28, 1992 to August 13, 1993. ALJ O'Leary also found that Plaintiff again became disabled on August 10, 1998, and that her disability continued to the present. Plaintiff appealed to the Appeals Council, and by a decision dated September 17, 2004, the Council reversed ALJ O'Leary's November 21, 2001 decision and ordered a new hearing.

The final hearing on Plaintiff's claim was held on January 21, 2005. Plaintiff again testified, but only as to her current disability. In a decision dated July 26, 2005, ALJ O'Leary affirmed every part of his November 21, 2001 decision. Plaintiff appealed to the Appeals Council, and by notice dated May 7, 2007, the Council declined further review without addressing Plaintiff's contentions.

  B. *Factual Background*

    i. <u>Medical Records</u>

Limited medical records exist for the period from 1982 to 1992, during which Plaintiff was eleven to twenty-two years old. A hospital discharge indicates that Plaintiff was hospitalized for spinal surgery from June 13 to July 1, 1983. Plaintiff had been diagnosed with scoliosis

4

about a year and a half prior to the surgery.  The procedure, performed by Dr. Rangaswamy, involved a spinal fusion and the implantation of a Harrington rod to straighten the spine.  X-rays taken following the surgery showed the curvature to be improved.  Notes and records following the surgery indicate that Plaintiff had five follow-up visits with Dr. Rangaswamy.  The record indicates that through three visits up to and including October 11, 1983, Plaintiff's recovery was normal.  Plaintiff, however, complained of back pain during a visit on May 14, 1984.  At that time, it appears that Dr. Rangaswamy suspected possible "pseudoarthrosis," i.e., a failed spinal fusion.  On August 13, 1984, the last visit for which there is a record, plaintiff was described as having "no complaints" and her spine was "extremely well aligned."  A series of spinal x-rays from June 1983 through May 1985 indicate that the Harrington rod was in good or satisfactory position.  These x-rays also indicate that Plaintiff continued to have residual, moderate scoliosis, however later x-rays in the series suggest the curvature may have been increasing.

     No other relevant medical records exist for the period from 1984 to 1992.  Plaintiff was diagnosed with Hodgkin's Disease in the first half of 1992.  During treatment, Plaintiff complained of back pain to her oncologist, Dr. Valentine.  An x-ray taken on June 24, 1992 exhibited scoliosis to a "fairly marked" degree, and x-rays taken on November 1993 showed scoliosis to a "marked" degree in one view and "moderate" in another.  Plaintiff, however, did not require treatment for her pain.

     Dr. Hoppenfeld examined Plaintiff on November 21, 1995, at which time she was apparently experiencing pain in the lower thoracic region.  The pain subsided when treated with anti-inflammatory medication, but returned after Plaintiff gave birth to a daughter.  An x-ray

revealed Plaintiff's spinal curvature to be 43-degrees, thus greater than the 40-degree curve found prior to the original 1983 surgery. Dr. Hoppenfeld apparently suspected the Harrington rod to be the source of the pain and considered removal.

Plaintiff further complained of middle thoracic pain to Dr. Carl Giordano and Dr. Steven Dorsky at the New Jersey Spine Center. Dr. Giordano ruled out pseudoarthrosis after conducting bone scans, and was apparently concerned that Plaintiff's symptoms were caused by a recurrence of cancer. Dr. Dorsky suspected pseudoarthrosis, although no tests confirmed this. On June 18, 1998, Dr. Dorsky discussed surgery with Plaintiff to remedy her persistent pain, noting that other surgeons he consulted with had recommended removing the Harrington rod. In August 1998, Dr Dorsky removed the Harrington rod and confirmed the pseudoarthrosis.

The discharge summary following this surgery notes Plaintiff's long history of back pain. Additionally, a letter offered by Dr. Dorsky comments that Plaintiff's back pain was never resolved following her first surgery, and that her progressive curvature following her first surgery "is certainly suggestive of a possibility of a non-union." Finally, Plaintiff saw Dr. Dorsky in 2000, at which time he noted that her curvature had increased since the second surgery, suggestive of "another previously undiagnosed pseudoarthrosis."

    ii.  <u>Medical Evaluations</u>

Dr. Valentine treated Plaintiff during the period from 1992 to 1993 following her cancer diagnosis. In his report written April 12, 1993, Dr. Valentine attributed Plaintiff's disability to persistent pain from scoliosis and the Harrington rod. Dr. Valentine stated that the condition limited Plaintiff to less than one hour each of continuous standing or sitting, that she could not

lift in excess of twenty pounds, and that she could not walk more than two blocks. In a follow-up evaluation completed August 13, 1993, Dr. Valentine placed further limits on Plaintiff's standing, noting that Plaintiff's condition antedated her Hodgkin's disease and suggesting that she would likely remain disabled indefinitely.

Dr. Hoppenfeld, an orthopedic surgeon, began treating Plaintiff in January 1994. In an affidavit dated June 27, 1996, Dr. Hoppenfeld noted that Plaintiff had suffered from persistent pain since becoming his patient, and stated that the pain prevented her from sitting or standing 30-60 minutes or from lifting her seven-month old child. He stated that her condition was legitimate and consistent with x-rays and his examinations.

Dr. Dorsky's evaluations did not express views on plaintiff's residual functional capacity. Dr. Dorsky did suspect, however, that despite the lack of any x-rays showing that the original spinal fusion had not been successful, an undetected pseudoarthrosis existed that would explain Plaintiff's symptoms.

Dr. Johnson was Plaintiff's primary care physician during the period from 1992 to 1999. Dr. Johnson relied upon Drs. Hoppenfeld and Dorsky for information about Plaintiff's back condition. In a report dated November 9, 1999, Dr. Johnson limited Plaintiff to less than sedentary work due to chronic back pain.

Dr. Sabato is a neurologist who began treating Plaintiff in 2000. In an affirmation dated October 17, 2001, he commented that given Plaintiff's past history and current condition, it is plausible that Plaintiff had been continuously disabled since 1983.

Dr. Graham is a non-treating physician who conducted an evaluation of Plaintiff at the

7

SSA's request on October 3, 1992. He found that Plaintiff had either no scoliosis or mild scoliosis and that Plaintiff had no functional deficits.

### iii.   Testimony

The only testimony offered by Plaintiff that is included in the Transcript was given at the January 21, 2005 hearing. It appears to be of little relevance to this discussion because it pertains only to Plaintiff's disability during the period from 2001 to 2005.

Harlan Melk, M.D., is a specialist in internal medicine and maxillofacial radiology. Dr. Melk's testimony from the October 25, 2001 hearing is relevant to this matter. At that hearing, Dr. Melk stated that he could not give an expert opinion on Plaintiff's disability after 1984. He noted that Plaintiff had some improvement following the 1983 surgery, but that her scoliosis persisted thereafter. The record did not indicate the degree of the continued scoliosis.

Matrin Fechner, M.D., is a specialist in internal medicine. Dr. Fechner testified on January 21, 2005. Dr. Fechner stated that Plaintiff was disabled in 1998, and that it was likely that her disability had begun sometime before then, but that it was unclear from the record how long. Dr. Fechner stated that the medical record during the period from 1992 and 1997 was consistent with an earlier onset of the disability. He commented that it was possible that Plaintiff continued to have significant pain following the 1983 surgery. Because the medical record between 1984 and 1998 was "sparse," however, Dr. Fechner stated that it was impossible to know how disabled Plaintiff was during that time or when the disability began.

## II.   STANDARD OF REVIEW

### A.   *Scope of Review*

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom., Williams v. Shalala, 507 U.S. 924 (1993). "Substantial evidence" means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. Some types of evidence will not be "substantial." For example,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g. that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983). "Where the ALJ's findings of fact are supported by substantial evidence, the [reviewing court] is bound by these findings, even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001). Thus, substantial evidence may be slightly less than a preponderance. Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988).

"The reviewing court, however, does have a duty to review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)). In order to review the evidence, "a court must 'take into account

9

whatever in the record fairly detracts from its weight.'" Id. (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)). The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)). As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of HEW, 567 F.2d 258, 259 (4th Cir. 1977)). "[The reviewing court] need[s] from the ALJ not only an expression of the evidence []he considered which supports the result, but also some indication of the evidence which was rejected." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Without such an indication by the ALJ, the reviewing court cannot conduct an accurate review of the matter; the court cannot determine whether the evidence was discredited or simply ignored. See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter, 642 F. 2d at 705); Walton v. Halter, 243 F.3d 703, 710 (3d Cir. 2001). "The district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182 (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

    B.    *Statutory Standard for Eligibility for SSI Benefits*

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382. Under the Act, a claimant is eligible for benefits if she meets the income and resource limitations of 42 U.S.C. §§ 1382a and 1382b, and demonstrates that she is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is disabled for these purposes only if her physical or mental impairments are "of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. For the first two steps, the claimant must establish (1) that she has not engaged in "substantial gainful activity" since the onset of the alleged disability, and (2) that she suffers from a "severe impairment" or "combination of impairments." 20 C.F.R. § 404.1520(a)-(c). Given that the claimant bears the burden of establishing these first two requirements, her failure to meet this burden automatically results in a denial of benefits, and the court's inquiry necessarily ends there. Bowen v. Yuckert, 482 U.S. 137, 146–47 n.5 (1987) (delineating the burdens of proof at each step of the disability determination).

If the claimant satisfies her initial burdens she must provide evidence that her impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("Listing

11

of Impairments"). 20 C.F.R. § 404.1520(d). Upon such a showing, she is presumed to be disabled and is automatically entitled to disability benefits. Id. If she cannot so demonstrate, the benefit eligibility analysis requires further scrutiny. The fourth step of the analysis focuses on whether the claimant's residual functional capacity sufficiently permits her to resume her previous employment. 20 C.F.R. § 404.1520(e). If the claimant is found to be capable to return to her previous line of work, then she is not "disabled" and not entitled to disability benefits. Id. Should the claimant be unable to return to her previous work, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial, gainful work. 20 C.F.R. § 404.1520(f). If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits. Yuckert, 482 U.S. at 146-47 n.5.

   C. *The Record Must Contain Objective Medical Evidence*

  Under the Act, disability must be established by objective medical evidence. "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section." Id. Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

12

Id.; see 42 U.S.C. § 1382c(a)(3)(A). Credibility is a significant factor. When examining the record:

> The adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities. To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. The requirement for a finding of credibility is found in 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4).

Nevertheless, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

### III. DISCUSSION

Plaintiff argues that the Commissioner's decision finding no disability during the period from 1984 to 1998 should be reversed because it failed to give adequate weight to the opinions of Plaintiff's treating physicians, improperly denied Plaintiff the benefits of the Zebley settlement, and because the Commissioner denied Plaintiff a fair hearing allowing for a proper credibility determination. The Commissioner responds that the decision should be affirmed because the ALJ properly considered the opinions of Plaintiff's treating physicians, the Zebley provisions do not apply in this case, and because the ALJ's evaluation of Plaintiff's credibility is supported by substantial evidence. Because the Court finds that the Commissioner did not adequately explain its decision with respect to Plaintiff's treating physician Dr. Sabato, and because further explanation is required in support of the Commissioner's Zebley finding, the Court is unable to

determine whether the Commissioner's decision is supported by "substantial evidence," and this matter is remanded for further explanation on these issues.

      A.     *The Treating Physician Rule Claim*

Plaintiff argues that the ALJ failed to give adequate weight to the opinions of Plaintiff's treating physicians while making his determination. The ALJ is tasked with weighing the credibility of all medical and non-medical evidence. Yensick v. Barnhart, 245 Fed. App'x 176, 181 (3d Cir. 2007). During this process, the opinions of treating physicians are entitled to "substantial and at times even controlling weight" because of the "detailed picture" and "unique perspective" that they can provide. See id. (citing 20 C.F.R. § 404.1527(d)(2)). Such opinions, however, are entitled to controlling weight only when "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [when] not inconsistent with other substantial evidence" in the record. Fargnoli, 247 F.3d at 43. In cases where the record contains contradictory medical evidence, including an opinion by a non-treating, non-examining physician, the ALJ may accept the most credible opinion. Yensick, 245 Fed. App'x at 181.

Here, Plaintiff argues that the ALJ failed to credit the opinions of Plaintiff's four treating physicians: Drs. Valentine, Hoppenfeld, Johnson and Sabato. With respect to the first three physicians, however, it appears that the ALJ properly and adequately explained his reasoning for accepting or rejecting each. With respect to Dr. Valentine, for example, the ALJ found his opinion to be "due relatively little weight" because it related to matters outside of his expertise, was not supported by specific clinical findings or imaging study results, and was inconsistent with other evidence of record. Similarly, Dr. Hoppenfeld's opinion regarding Plaintiff's

"inability to lift anything at all" was rejected because it was unsupported by the objective findings, was inconsistent with other evidence, and because it appeared to be based on the faulty premise that not being able to lift a seven-month old baby is the equivalent of being unable to lift anything at all.  Finally, Dr. Johnson's opinion that Plaintiff had a lower residual functional capacity than that found by the ALJ was discredited because it was not rendered until 1999 and appeared to be based upon after-the-fact difficulties and imaging study findings showing new and deteriorating spinal impairments.

While the Court recognizes that the opinions of treating physicians are due substantial weight when"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence," the Court nonetheless finds that, in this case, the ALJ gave proper weight to each of the physicians' opinions, and that he adequately explained his reasoning for accepting or rejecting each.  See Fargnoli, 247 F.3d at 43.  Furthermore, given the well-delineated "contradictory medical evidence" identified by the ALJ in his Opinion, the Court finds that the ALJ was entitled to accept the most credible medical opinion, even if it was provided by Dr. Fechner, a non-treating, non-examining physician.  See Yensick, 245 Fed. App'x at 181.

A different context exists with respect to Dr. Sabato's opinion, however, because it appears that the ALJ failed to explain his reasons for discounting that evidence.  Where conflicting probative evidence exists in the record, a "particularly acute need for an explanation of the reasoning behind the ALJ's conclusions" arises, and courts will vacate or remand a case where such an explanation is not provided.  Fargnoli, 247 F.3d at 42; see also Yensick, 245 Fed. App'x at 183.  Although the ALJ may weigh the credibility of the evidence, he is expected to give "some indication of the evidence that he rejects and his reason(s) for discounting that

15

evidence." Fargnoli, 247 F.3d at 43.

Here, Dr. Sabato opined that Plaintiff's disability claim is "plausible and consistent with her current condition and past medical history," based in part on "her medical history, findings on physical examination, and radiological studies." The ALJ failed to address Dr. Sabato's opinion, however, leaving little indication as to whether Dr. Sabato's probative evidence "was not credited or simply ignored." Yensick, 245 Fed. App'x at 183. The Court is left in the dark as to how the ALJ perceived Dr. Sabato's opinion because "the ALJ did not perform the duty incumbent upon him to explain the reasons that he accepted or rejected [the doctor's] conclusions." Id. Accordingly, because the ALJ failed to explain his reasons for apparently rejecting Dr. Sabato's medical opinion, this case will be remanded for further explanation on that issue. See, e.g., Fargnoli, 247 F.3d at 43 (remanding for "fail[ing] to consider and explain reasons for discounting all of the pertinent evidence"); Yensick, 245 Fed. App'x at 183 (remanding for failing to explain decision contrary to opinion of treating physician). On remand, the ALJ must fully consider Dr. Sabato's opinion as it relates to other evidence in the case. If the ALJ concludes that Dr. Sabato's opinion is not supported by substantial evidence, he shall state his reasons for so finding. If, however, he determines that Dr. Sabato's opinion is supported by substantial evidence and controlling, he must reassess Plaintiff's claim in light of that information.

B.     *The Zebley Claim*

Plaintiff next argues that she was entitled to benefits for the period from 1984 to 1998 under the provisions of the Zebley settlement. Following the Supreme Court's decision in Sullivan v. Zebley, 493 U.S. 521 (1990), the Zebley class plaintiffs and the government entered into a stipulation (the "Settlement") requiring re-adjudication of essentially all children's SSI

16

claims decided between January 1, 1980 and February 27, 1990. The Settlement reflected concerns that, after a lapse of more than a decade, records relating to a child's condition might be unavailable. Accordingly, in cases where evidence was scant, the Settlement directed the Commissioner to "infer" disability for the interim period, provided that: (1) a subsequent finding of disability under the disability program had been made; and (2) no reliable evidence of non-disability existed for the interim period, such as, for example, evidence of a traumatic onset of disability or a new impairment, or contrary medical judgment. See Zebley v. Sullivan, 1991 WL 65530, at *9 (E.D. Pa. Mar. 14, 1991); see also Miller v. Chater, 929 F. Supp. 95, 101–02 (W.D.N.Y. 1995). In cases where no subsequent finding of disability exists, the Settlement directs the Commissioner to determine "whether it is reasonable to presume that the class member's past condition and impairments were as severe as they are currently." See Zebley, 1991 WL 65530, at *9.

     Plaintiff argues that she is entitled to the first presumption of the Zebley Settlement because her benefit awards of 1982 and 1998 are based on findings of scoliosis and because her condition during "much of the intervening 15 years or so is very unclear." Her argument is based on a faulty premise, however, because it relies on the ALJ's July 26, 2005 finding that Plaintiff was disabled as the subsequent determination within the meaning of the Settlement. As the Government correctly points out, however, no subsequent determination finding Plaintiff disabled was in effect at the time of ALJ O'Leary's decision, as all previous findings of disability had either been vacated or remanded for further consideration.[2] See, e.g., Martinez v. Apfel, 1998 WL 107108, *1 (E.D. Pa. Mar. 10, 1998). Thus, the ALJ's task was not to look for

---

[2]Contrary to Plaintiff's assertion that the Government raises this argument for the first time on appeal, it appears that the ALJ considered this exact issue and applied the proper standard for cases involving no subsequent decision, as evidenced by his statement that "the back impairments were not persistently as severe" prior to 1998.

evidence of non-disability, but rather to determine "whether it is reasonable to presume that [Plaintiff's] past condition and impairments were as severe as they are currently."  See Zebley, 1991 WL 65530, at *9.  In this case, the ALJ appears to have addressed this exact question, citing both Dr. Fechner's medical expert opinion, as well as his own finding that the "objective medical evidence does not corroborate the extent and persistence of back pain that the claimant has alleged," to find that Plaintiff's back impairments "were not persistently as severe" prior to June 1998 as they were thereafter.  But while the ALJ appears to have applied the appropriate standard, his basis for relying in part on Dr. Fechner's testimony is unclear to the Court.  Review of Dr. Fechner's testimony, for example, appears to show that while Dr. Fechner did make an explicit finding of a "listing-level" disability only for the period beginning in 1998, his statements with respect to the earlier period are merely that "there were some problems before August of '98 at least going back some months," but that the record is "too sparse to really know what was going on."  Thus, while relying on Dr. Fechner's opinion may be appropriate in a standard five-step disability evaluation, it appears inappropriate under the circumstances of the Zebley presumption to base a finding of non-severity simply on a medical expert's statement that the record is "too sparse to really know."  Accordingly, the Court will remand with instructions to the ALJ to more fully explain his basis for finding that Plaintiff's impairments "were not persistently as severe" prior to 1998.  The ALJ should explain his basis for relying on Dr. Fechner's opinion, and whether, in the absence of that opinion, his decision would be the same.

    C.    *The Credibility Claim*

Finally, Plaintiff argues that she was denied a fair hearing allowing for a proper credibility determination because the Commissioner failed to consider her past testimony.  A claimant's subjective complaints "may, standing alone, establish a finding of total disability."

Carter v. Railroad Ret. Bd., 834 F.2d 62, 65 (3d Cir. 1987). As such, the Commissioner is required to give proper consideration to a claimant's subjective complaints even when "not fully corroborated by objective medical evidence." Id.

In this case, Plaintiff argues that the ALJ's failure to locate and consider recordings of her testimony at past hearings denied her the opportunity for a fair hearing. The Court disagrees. While it is true that tapes containing Plaintiff's prior testimony were missing and not heard at the 2005 hearing, review of the record nonetheless demonstrates that Plaintiff was provided with the opportunity to testify as to her subjective complaints at the hearing, apparently without limitation. Furthermore, it appears that many of Plaintiff's subjective complaints were made known to the ALJ through the testimony of her treating physicians and medical reports recorded through the years. Finally, it appears that the ALJ properly weighed the evidence, explained his reasons for rejecting evidence supporting plaintiff's claims, and provided a thorough discussion and analysis of objective medical evidence. Accordingly, because the Commissioner properly considered Plaintiff's subjective complaints, the Court finds that Plaintiff was not denied a fair hearing.

## IV. CONCLUSION

For the reasons stated, the Court finds that this matter shall be remanded for further proceedings not inconsistent with this Opinion. An appropriate Order accompanies this Opinion.

S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date: December  30 , 2008
Orig.: Clerk
cc: All Counsel of Record
Hon. Mark Falk, U.S.M.J.
File